# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEENA WARECKI,<br><br>               Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>               Defendant. | Case No.  1:20-cv-01519-BAK (SAB)<br><br>ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING ACTION TO COMMISSIONER FOR FURTHER PROCEEDINGS<br><br>(ECF Nos. 19, 20) |

## I.

## INTRODUCTION

Plaintiff Sheena Warecki ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for Social Security benefits pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]  For the reasons set forth below, Plaintiff's appeal shall be granted, and the action shall be remanded to the Commissioner for further proceedings.

---

[1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (ECF Nos. 7, 9, 10, 24.)

1

2

## II.

## BACKGROUND[2]

Plaintiff protectively filed an application for Social Security benefits under Title II on January 5, 2017, and an application for Supplemental Security Income (SSI) under Title XVI on January 25, 2017, alleging disability beginning March 15, 2016, for both.  (Admin. Rec. ("AR") 89–90, ECF No. 11-1.)  Plaintiff's claims were both initially denied on May 9, 2017, and denied upon reconsideration on January 29, 2018.  (AR 89–90, 123–24, 125–29.)  On November 25, 2019, Plaintiff appeared before Administrative Law Judge Terrence Hugar (the "ALJ"), via videoconference, for an administrative hearing.  (AR 33–64.)  On January 10, 2020, the ALJ issued a decision denying benefits.  (AR 12–32.)  On September 8, 2020, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (AR 1–6.)

Plaintiff initiated this action in federal court on October 28, 2020, and seeks judicial review of the denial of her applications for benefits.  (ECF No. 1.)  The Commissioner lodged the operative administrative record on August 17, 2021.  (ECF No. 11.)  On November 5, 2021, Plaintiff filed an opening brief.[3]  (ECF No. 19.)  On December 6, 2021, Defendant filed a brief in opposition.  (ECF No. 20.)  No reply brief was timely filed, and the matter is deemed submitted.

## III.

## LEGAL STANDARD

### A.    The Disability Standard

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[4] which can be expected to result in death

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  However, the Court will refer to the parties' briefings by their ECF pagination.

[3] In her opening brief, which is 29 pages exclusive of tables, Plaintiff requests leave to file a motion exceeding the 25-page limit.  (ECF No. 19 at 1.)  In light of the extensive medical records pertaining to this matter (totaling over 866 pages in length) and multiple issues addressed in the briefing, the Court grants Plaintiff's request.

[4] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities

2

or which has lasted or can be expected to last for a continuous period of not less than 12 months."
42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five-step sequential
evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. § 404.1520;[5]
Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1194 (9th Cir. 2004).  The five steps in
the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful
> activity?  If so, the claimant is not disabled.  If not, proceed to step
> two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to
> limit his or her ability to work?  If so, proceed to step three.  If not,
> the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of
> impairments, meet or equal an impairment listed in 20 C.F.R., pt.
> 404, subpt. P, app. 1?  If so, the claimant is disabled.  If not,
> proceed to step four.
>
> Step four: Does the claimant possess the residual functional
> capacity ("RFC") to perform his or her past relevant work?  If so,
> the claimant is not disabled.  If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the
> claimant's age, education, and work experience, allow him or her to
> adjust to other work that exists in significant numbers in the
> national economy?  If so, the claimant is not disabled.  If not, the
> claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).  The burden of proof is
on the claimant at steps one through four.  Ford v. Saul, 950 F.3d 1141, 1148 (9th Cir. 2020).  A
claimant establishes a *prima facie* case of qualifying disability once she has carried the burden of
proof from step one through step four.

Before making the step four determination, the ALJ first must determine the claimant's
RFC.  20 C.F.R. § 416.920(e); Nowden v. Berryhill, No. EDCV 17-00584-JEM, 2018 WL
1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [her]

---

that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

[5] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §§ 404.1501 et seq.; however, Plaintiff is also seeking supplemental security income, 20 C.F.R. §§ 416.901 et seq.  The regulations are generally the same for both types of benefits.  Therefore, further references herein are generally to the disability insurance benefits regulations, 20 C.F.R. §§ 404.1501 et seq.

limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform given her RFC, age, education, and work experience. 20 C.F.R. § 416.912(g); Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006). To do this, the ALJ can use either the Medical Vocational Guidelines ("grids"), or call a vocational expert ("VE"). See 20 C.F.R. § 404 Subpt. P, App. 2; Lounsburry, 468 F.3d at 1114; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). "Throughout the five-step evaluation, the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.' " Ford, 950 F.3d at 1149 (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

**B.    Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In determining whether to reverse an ALJ's decision, the Court reviews only those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). Further, the Court's review of the Commissioner's decision is a limited one; the Court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002)

(quoting <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)); <u>see also</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high."  <u>Biestek</u>, 139 S. Ct. at 1154.  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard."  <u>Thomas v. CalPortland Co.</u>, 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); <u>see also</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  <u>Stout</u>, 454 F.3d at 1055–56.  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination."  <u>Shinseki v. Sanders</u>, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  <u>Hill v. Astrue</u>, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  Nor may the Court affirm the ALJ on a ground upon which he did not rely; rather, the Court may review only the reasons stated by the ALJ in his decision.  <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007); <u>see also</u> <u>Connett v. Barnhart</u>, 340 F.3d 871, 874 (9th Cir. 2003).  Nonetheless, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  <u>Ford</u>, 950 F.3d at 1154 (quoting <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005)).

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff raises two issues on appeal: (1) whether the ALJ committed harmful error in failing to defer and afford "greatest weight" to the well-supported Medical Source Statements (MSS) of the long-term, treating pain management specialist physician, Dr. O'Laughlin, absent "specific and legitimate" reasons over the opinion of the non-examining state agency physicians; and (2) whether the ALJ committed harmful error by failing to provide the requisite "clear and convincing" reasons for rejecting symptomology evidence.  (ECF No. 19 at 5.)  The Court will

1    address Plaintiff's arguments in turn.

2           **A.**       **Whether the ALJ Erred in Assessing the Medical Opinion Evidence**

3           Plaintiff contends the ALJ failed to provide "clear and convincing" reasons for according

4    "reduced weight" to Dr. O'Laughlin's opinion as treating physician, while according greater

5    weight to the opinions of the non-examining state agency physicians.  (Id. at 18–28.)

6           1.    Legal Standard

7           When evaluating applications filed before March 27, 2017, as here, the ALJ must explain

8    the weight he gives to all medical source opinions.  See 20 C.F.R. § 404.1527(c).  There are three

9    types of physicians: "(1) those who treat the claimant (treating physicians); (2) those who

10   examine but do not treat the claimant (examining physicians); and (3) those who neither examine

11   nor treat the claimant [but who review the claimant's file] (nonexamining [or reviewing]

12   physicians)."  Holohan v. Massanari, 246 F.3d 1195, 1201–02 (9th Cir. 2001) (citations omitted).

13          Generally, a treating physician's opinion carries more weight than an examining

14   physician's opinion, and an examining physician's opinion carries more weight than a reviewing

15   physician's opinion.  Id.  The reason a treating physician's opinion is entitled to the greatest

16   weight is "because the treating physician is hired to cure and has a better opportunity to know and

17   observe the claimant."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)); see also Lester

18   v. Chater, 81 F.3d 821, 833 (9th Cir. 1995) ("The treating physician's continuing relationship

19   with the claimant makes him especially qualified to evaluate reports from examining doctors, to

20   integrate the medical information they provide, and to form an overall conclusion as to functional

21   capacities and limitations, as well as to prescribe or approve the overall course of treatment.").

22   Nevertheless, a non-examining opinion may constitute substantial evidence if it is consistent with

23   other independent evidence in the record.  See Thomas, 278 F.3d at 957; Orn, 495 F.3d at 632–

24   33.

25          If a treating or examining physician's opinion is uncontradicted, the ALJ may reject it

26   only by offering "clear and convincing reasons that are supported by substantial evidence."

27   Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  Conversely, "[i]f a treating or

28   examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

by providing specific and legitimate reasons that are supported by substantial evidence." Id. (citing Lester, 81 F.3d at 830–31).  Similarly, where a treating or examining doctor's opinion is contradicted by medical evidence, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence in the record.  See Andrews, 53 F.3d at 1041.  However, in doing so, the ALJ must also "consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion." Treviso v. Berryhill, 871 F.3d 664, 676 (9th Cir. 2017) (ALJ's failure to consider treating physician factors under 20 C.F.R. §§ 404.1527(c)(2)–(6) "*alone* constitutes reversible legal error.*" (emphasis added)).  The ALJ can satisfy the "specific and legitimate" burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes, 881 F.2d at 751).  Finally, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings." Bray v. Comm'r, Soc. Sec. Admin, 554 F.3d 1219, 1228 (9th Cir. 2009) (quotation and citation omitted).

    2.   Relevant Evidence

    **a.**    **The ALJ's Decision**

The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  (AR 16–27.)  At step one, the ALJ found the claimant had not engaged in substantial gainful activity since her alleged onset date, March 15, 2016.  (AR 18 (citing 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.).)  At step two, the ALJ found Plaintiff had the severe impairments of fibromyalgia, complex regional pain syndrome, migraine headaches, anxiety, chronic fatigue syndrome, obesity, and irritable bowel syndrome, which significantly limited the ability to perform basic work activities.  (Id. (citing 20 C.F.R. § 416.1520(c), 416.920(c)).)  The ALJ additionally found Plaintiff had a history of asthma, but determined this was a nonsevere impairment.

At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. §§

416.1520(d), 416.1525, 416.1526, 416.920(d), 416.925, and 416.926.   (AR 18.)   The ALJ explained that he noted Plaintiff was obese, but considered the additional and cumulative effects of Plaintiff's obesity in assessing the severity of Plaintiff's medically determinable impairments and the RFC, and concluded Plaintiff's obesity did not increase the severity of Plaintiff's coexisting impairments to the extent that the combination of Plaintiff's impairments meets or equals the requirements of any listing.   (AR 18–19.)   The ALJ also found Plaintiff's migraine headaches, irritable bowel syndrome, complex regional pain syndrome and chronic fatigue syndrome did not meet the listing criteria under sections 1.00 (Musculoskeletal System), 11.00 (Neurological System), 5.00 (for the digestive system), or 12.06 (for anxiety and obsessive-compulsive disorders), and found only that Plaintiff's symptoms for complex regional pain syndrome and chronic fatigue syndrome satisfied the requirements for listing 12.07 (for somatic symptom and related disorders) (discussed herein).   (AR 19.)

The ALJ also found Plaintiff's mental impairments, considered singly and in combination, did not meet the paragraph B criteria,[6] as follows.   Plaintiff had a "mild" limitation in understanding, remembering, or applying information because, while Plaintiff indicated she had problems with her memory (id. (citing AR 285)), she also indicated that she did not need any reminders to take care of personal needs and grooming or to take medications (id. (citing AR 283)); Plaintiff took two college classes during the semester of the hearing, and her grades are generally A's and B's (id. (citing AR 33–64)); during a mental consultative examination, Plaintiff's memory was noted to be intact as she was able to recall five digits forward and backwards and able to recall three of three items immediately and after a short delay (id. (citing AR 449)); and Plaintiff was noted to have no gross deficits in her memory function (id. (citing AR 380)).

The ALJ found Plaintiff had a "mild" limitation in interacting with others because she lived with her mother, father, aunt, and boyfriend at the time of the hearing (id. (citing AR 33–

---

[6] To satisfy "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in the following broad areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing themselves. (AR 19 (citing Listings 12.02, 12.04, 12.06).)

64)); Plaintiff indicated she has no problems getting along with others (id. (citing Ex. AR 285–86)); and during a mental status examination and other appointments, Plaintiff was observed to have good eye contact (id. (citing AR 449, 725–59)).

The ALJ found Plaintiff had a "moderate" limitation in concentrating, persisting, or maintaining pace because Plaintiff indicated she has problems concentrating but can follow written instructions well (id. (citing AR 285)); she testified that her depression affects her ability to concentrate but she is able to succeed in school because she records class or has notes which she reads/reviews at home, and that she only missed one question on her midterm in October 2019 (AR 19–20 (citing AR 33–64, 449)); Plaintiff reads and watches television for an hour/day (id. (citing AR 285)); at the mental consultative examination, Plaintiff was able to do simple math calculations (AR 20 (citing AR 449)); and during mental status examinations, Plaintiff was noted to have fair-to-good attention and concentration (id. (citing AR 725–59)).

Finally, the ALJ found Plaintiff had a "mild" limitation in adapting or managing herself because she indicated she sometimes needs help getting dressed, washing her hair, or getting food (id. (citing AR 282)); she is able to drive (id. (citing AR 33–64)); she is not able to do housework at home due to back pain and weakness in her arms (id. (citing AR 33–64)); she is able to prepare frozen dinners, sandwiches, and simple foods daily (id. (citing AR 283)); she is able to shop in stores for food and clothing, take care of her personal hygiene, and manage her finances (id. (citing AR 284, 448)); during the mental consultative evaluation, Plaintiff was noted to be fairly groomed with adequate personal hygiene (id. (citing AR 449)); during a mental status examination, Plaintiff was appropriately dressed (id. (citing AR 380)); and during another mental status examination, Plaintiff exhibited good insight and judgment (id. (citing AR 380, 725–59)).

Before proceeding to step four, the ALJ determined Plaintiff's RFC, through the date last insured, permitted her to perform

> light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except she is able to engage in frequent postural activities, but no climbing of ladders, ropes, or scaffolds.  Moreover, she is to have no exposure to hazards, such as unprotected heights and moving mechanical parts.  She is to have no concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  Finally, she is able to perform simple routine and repetitive tasks.

(AR 20.)

At step four, the ALJ found Plaintiff could not perform any past relevant work because there was none.  (AR 26.)  At step five, the ALJ determined Plaintiff could perform jobs existing in significant numbers in the national economy, specifically the jobs of routing clerk (DOT 222.687-022, light exertional, unskilled, SVP 2, with approximately 84,000 jobs in the national economy), cashier (DOT 211.462-010, light exertional, unskilled, SVP 2, with approximately 643,000 jobs in the national economy), and office helper (DOT 239.567-10, light exertional, unskilled, SVP 2, with approximately 74,000 jobs in the national economy).  (AR 26–27 (citing 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)).)  Therefore, the ALJ found Plaintiff was not under a disability at any time from March 15, 2016, through the date of the of the ALJ's decision (January 10, 2020).  (AR 27 (citing 20 C.F.R. §§ 404.1520(g), 416.920(g)).)

**b.      Treating Physician Dr. O'Laughlin**

Dr. O'Laughlin is one of Plaintiff's three treating physicians.[7]  He is a pain specialist, who has treated Plaintiff's fibromyalgia, complex regional pain syndrome, and related symptoms since November 1, 2016.  (AR 41, 45–46, 837.)  Over the course of treating Plaintiff, Dr. O'Laughlin issued four separate medical source statements (MSSs), which were summarized by the ALJ in his decision and are addressed herein.

i.      June 2, 2017 – Physical Medical Source Statement (AR 546–49)

On June 2, 2017, Dr. O'Laughlin completed a physical MSS, diagnosing Plaintiff with fibromyalgia and complex regional pain syndrome, with clinical findings of chronic pain syndrome and possible immune syndrome.  Dr. O'Laughlin noted the prognosis was "poor."

Dr. O'Laughlin opined Plaintiff's condition limited her to: walking no more than one block without rest or severe pain; sitting up to twenty minutes at a time; standing for only five to ten minutes at a time; sitting, standing and/or walking for less than two hours in an eight-hour workday; "occasionally" lifting and/or carrying less than ten pounds; "occasionally" twisting, stooping, or climbing stairs; never crouching/squatting or climbing ladders; using the fingers for

---

[7] As Plaintiff noted in her hearing testimony, Dr. Brar is her psychiatrist, and Dr. Linscheid is her primary care physician.  (AR 41.)

fine manipulation (bilaterally) no more than 5% of an eight-hour workday; using the hands for grasping, turning, or twisting objects no more than 5% of an eight-hour workday; and never using the arms for reaching in front of the body or overhead. Dr. O'Laughlin opined that Plaintiff required a sit/stand option; and that Plaintiff was required to elevate her legs for 10% of an eight-hour workday. Furthermore, Dr. O'Laughlin opined Plaintiff would likely be "off task" at least 25% of an eight-hour workday; that she is only capable of tolerating "minimal" low stress work; that she is likely to have "good days" and "bad days," but "mostly bad," resulting in more than four unplanned absences per month; and she would require unscheduled breaks every two hours for thirty minutes, wherein she would need to lie down and/or sit quietly. Dr. O'Laughlin also determined that a cane may be used, if needed, for pain, weakness, and insecurity.

ii.      May 15, 2019 – Fibromyalgia Medical Source Statement (AR 555–58)

On May 15, 2019, Dr. O'Laughlin completed a fibromyalgia MSS, concluding Plaintiff met the American College of Rheumatology criteria for fibromyalgia, exhibiting 18 trigger points with symptoms of: allodynia (hypersensitivity to touch), fatigue, chronic widespread pain, sleep disturbance, muscle weakness, subjective swelling, joint stiffness, muscle spasms, morning stiffness, premenstrual syndrome, irritable bowel syndrome, frequent severe headaches, temporomandibular joint dysfunction (TMJ), cognitive dysfunction ("fibro fog"), numbness and tingling, neuropathy, Raynaud's Phenomenon, Sicca Syndrome, dysmenorrhea, GERD, anxiety, and depression, with a poor prognosis. Further, Dr. O'Laughlin reported Plaintiff experienced pain in the lumbosacral, cervical, and thoracic spine and chest, and bilaterally in the shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet that was described as constant, moderate, intermittently severe, and worsened by changing weather, hormonal changes, fatigue, stress, movements/overuse, sleep problems, cold, and static position, and were coupled with medication side-effects of fatigue.

Dr. O'Laughlin opined these symptoms limited Plaintiff to: walking no more than one to two blocks without rest or severe pain; sitting up to ten to fifteen minutes at one time; standing up to ten to fifteen minutes at one time; sitting about four hours in an eight-hour workday; standing and/or walking less than two hours in an eight-hour workday; "rarely" (defined as 1% to 5% of an

eight-hour workday) lifting and/or carrying up to 10 pounds, twisting, stooping, crouching/squatting, looking up or down (sustained flexion of neck), turning the head right or left, or holding the head in static position; never climbing ladders or stairs; using the fingers for fine manipulation (bilaterally), using the hands for grasping, turning, or twisting objects, and using the arms for reaching in front of the body no more than 2.5% of an eight-hour workday; never using the arms for reaching overhead. Dr. O'Laughlin also opined that Plaintiff would require a sit/stand option; an unscheduled break every two to three hours to lie down; and, with prolonged sitting, to elevate her legs at heart level. Dr. O'Laughlin also opined that Plaintiff is likely to be "off task" more than 25% of an eight-hour workday; that she is incapable of even "low stress" work; and she is likely to have "good days" and "bad days," but "mostly bad."

iii.     August 31, 2019 – Fibromyalgia Medical Source Statement (AR 559–61)

On August 31, 2019, Dr. O'Laughlin completed another fibromyalgia MSS. This time, he concluded Plaintiff had a number of tender points "too numerous to count" and "all fibro tissue parts," and that Plaintiff had symptoms, signs, and associated conditions of: Allodynia, fatigue, chronic widespread pain, sleep disturbance, muscle weakness, subjective swelling, joint stiffness, muscle spasms, morning stiffness, premenstrual syndrome, irritable bowel syndrome, frequent severe headaches, TMJ, "fibro fog," posttraumatic stress disorder (PTSD), dysmenorrhea, dizziness, multiple chemical sensitivity, chronic fatigue syndrome, myofascial pain syndrome, anxiety, panic attacks, and depression with a fair to poor prognosis. Dr. O'Laughlin reported Plaintiff experienced pain located in the lumbosacral, cervical, and thoracic spine and chest, and bilaterally in the shoulders, arms, hands, fingers, hips, legs, knees, ankles, and feet that was constant and severe, and precipitated by changing weather, hormonal changes, fatigue, stress, movement/overuse, sleep problems, cold, and static position, and were coupled with medication side-effects of nausea, vomiting, and drowsiness.

As a result of her impairments, Dr. O'Laughlin opined Plaintiff was limited to: walking no more than one block without rest or severe pain; sitting thirty to forty-five minutes at one time; standing ten to fifteen minutes at one time; sitting, standing and/or walking less than two hours in an eight-hour workday; requiring a sit/stand option; using the fingers for fine manipulation

(bilaterally), using the hands for grasping, turning, or twisting objects, and using the arms for reaching in front of the body or overhead no more than 20% of an eight-hour workday.  Dr. O'Laughlin also opined that Plaintiff would likely be "off task" more than 25% of an eight-hour workday; that she is likely to be "off task" more than 25% of an eight-hour workday; that she is limited to low stress work; and that her impairments are likely to produce "good and bad days," resulting in more than four unplanned absences per month.

iv.    June 2019[8] Mental RFC Medical Source Statement (AR 562–65)

Approximately in June 2019, Dr. O'Laughlin completed a mental RFC MSS, noting he co-treated Plaintiff with Drs. Linscheid and Moffett.   Dr. O'Laughlin opined Plaintiff's performance would be precluded for 5% of an eight-hour workday in: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; understanding and remembering detailed instructions; carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to critics from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  Dr. O'Laughlin opined Plaintiff's performance would be precluded for 10% of an eight-hour workday in: carrying out detailed instructions; maintaining attention and concentration for extended periods of time; and performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances.

Based on Plaintiff's physical and mental limitations in combination, Dr. O'Laughlin

---

[8] While the MSS appears to be undated, based on the statement that Dr. O'Laughlin had been treating Plaintiff for approximately two years and seven months as of the time he completed the MSS (and the record indicates Dr. O'Laughlin commenced treating Plaintiff around November 1, 2016), the Court surmises Dr. O'Laughlin prepared this RFC MSS approximately in or around June 2019.

1  opined Plaintiff would be "off task" more than 30% of an eight-hour workday; she would be

2  absent or unable to complete an eight-hour workday for five or more days per month due to her

3  impairments or treatment; and her global assessment of functioning (GAF) score was 41–50.[9]

4  Finally, Dr. O'Laughlin concluded Plaintiff would be less than 50% efficient than an average

5  worker.

6         3.   <u>Analysis</u>

7        Plaintiff's application was filed before March 2017, thus the treating source rule applies to

8  this matter.  <u>Holohan</u>, 246 F.3d at 1201–02.  As such, treating physician Dr. O'Laughlin's

9  opinion would carry more weight and, assuming Dr. O'Laughlin's opinion was contradicted by

10  the medical evidence as the ALJ contends, the ALJ could only discount Dr. O'Laughlin's opinion

11  by articulating specific and legitimate reasons for doing so that are supported by substantial

12  evidence. <u>Id.</u>; <u>Bayliss</u>, 427 F.3d at 1216; <u>Lester</u>, 81 F.3d at 830–31.

13        In collectively assigning Dr. O'Laughlin's multiple opinions only "some weight," while

14  comparatively favoring the opinion of non-examining Disability Determination Services (DDS)

15  physician E. Wong, M.D. with "great weight,"[10] the ALJ provided the following explanation,

16  recounted in its entirety:

17            The claimant's treating physician Thomas O'Laughlin issued a
          number of opinions regarding the claimant's ability to work, which

18            the undersigned collectively assigns little weight. . . [I]n June 2017
          and May and August 2019, Dr. O'Laughlin set forth a number of

19            sitting, standing, walking, lifting, manipulative, and environmental
          limitations and opined that the claimant would be absent from work

20            more than four days a month due to her impairments (14F; 16F/2-4;
          17F/2-3).  On an unknown date, he opined that the claimant had a

21            number of mental limitations, environmental limitations, would
          likely be off task or absent regularly, and would be unable to

22

23  [9] A GAF of 41–50 is indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep

24  a job)." (<u>See</u> AR 25 (citing DSM-IV, 4th Ed., p. 32).)

25  [10] Dr. Wong opined Plaintiff was capable of light work with frequent postural limitations, but no climbing of ladders,
ropes, or scaffolds, and Plaintiff needed to avoid concentrated exposure to pulmonary irritants and hazards.  (Ex.

26  5A/11–13.)  But for the addition of the finding that Plaintiff is able to perform simple routine and repetitive tasks, Dr.
Wong's entire opinion is mirrored in the ALJ's RFC determination.  (<u>See</u> AR 20.)  The reasoning the ALJ provides

27  for according Dr. Wong's opinion "great weight" is that the opinion "is supported by the treatment records, which
demonstrate that the claimant treated her physical or mental impairments with conservative treatment methods . . .

28  [and] is consistent with results of the claimant's physical and mental status examinations, which were generally
within normal limits." (AR 24 (internal quotations omitted).)

maintain regular employment (18F).  Additionally, Dr. O'Laughlin assigned the claimant a Global Assessment Functioning (GAF) score of 41-50 (18F/4) . . .  The assessment of a GAF of 41–50 appears to be out of proportion with the recitation of the claimant's activities and social functioning, and the evaluator did not explain how the low GAF was assessed (18F).  **Although [he] is one of the claimant's treating physicians, Dr. O'Laughlin's opinions are not supported by the treatment records, which demonstrate that the claimant treated her physical and mental impairments with conservative treatment methods and reported some improvement (4F-6F; 12F/26-28, 42; 13F/4; 21F/79; 22F; 23F). Furthermore, his opinion is not consistent with the results of the majority of the physical and mental examinations, which were within normal limits (6F; 9F; 10F; 11F; 21F; 22F).**

(AR 24–25 (emphasis added).)  The Court finds this explanation for discounting Dr. O'Laughlin's medical opinions does not satisfy the specific and legitimate standard.

First, the ALJ's reasons for rejecting Dr. O'Laughlin's medical source statements are conclusory and provide no real rationale as to why his opinions should not be accorded the greater weight to which they are entitled.  See Beech v. Colvin, No. SACV 13-00782-MAN, 2014 WL 2931177, at *8 (C.D. Cal. Jun. 26, 2014) (finding harmful error where ALJ's reason for rejecting treating source opinion was "impermissibly conclusory and provides no specific reference to any inconsistencies between [the treating physician's] opinion and plaintiff's treatment records [and instead] merely states [the] 'opinion is inconsistent with [plaintiff's] medical records.' "); Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299 (9th Cir. 1999) ("conclusory reasons will not justify an ALJ's rejection of a medical opinion."); McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989) ("broad and vague" reasons for rejecting a treating physician's opinion "do not suffice").  As demonstrated by the ALJ's discussion of Dr. O'Laughlin's opinions, which is quoted verbatim supra, the ALJ does not identify which portion of any of the four identified opinions is unsupported by or inconsistent with the record.  Indeed, the ALJ does not address any of the distinct findings asserted in any opinion but instead lumps the four discrete opinions together and reductively describes them as "set[ting] forth a number of sitting, standing, walking, lifting, manipulative, and environmental limitations" (AR 25), to which the ALJ "collectively assigns little weight" (AR 24).  Thus, the Court cannot even ascertain which limitation/s or portion/s of Dr. O'Laughlin's opinion the ALJ is discounting.

Nor does the ALJ identify which evidence in the record contradicts Dr. O'Laughlin's opinion to support his finding. Instead, the ALJ cites to several exhibits from the record, in their entirety, without identifying any particular statement or contention. For example, the ALJ generally relies upon "4F–6F; 12F/26–28, 42; 13F/4; 21F/79; 22F; 23F" to support the finding that Plaintiff's treatment methods were "conservative," and that she reported "some improvement." (AR 24–25.) Similarly, the ALJ references the totality of exhibits "6F; 9F; 10F; 11F; 21F; 22F" to support the finding that Plaintiff's physical and mental examinations were "within normal limits," without identifying or discussing a single, specific examination within the two hundred and sixty-three pages of records generally cited (*i.e.*, AR 383–426, 441–478, 579–759).[11]

As to the characterization of Plaintiff's treatment as "conservative," generally speaking, evidence of conservative treatment may constitute a legitimate reason to discount a claimant's symptoms or a physician's opinion. See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007). Here, however, since the ALJ neither identifies which treatments he characterizes as "conservative" nor identifies purportedly "aggressive" treatments Plaintiff could, but did not, pursue, the Court cannot conclude the ALJ's finding that Plaintiff's treatments were "conservative" is properly supported by substantial evidence. See Lapeirre-Gutt v. Astrue, 382 Fed. App'x 662, 664 (9th Cir. 2010) (holding an ALJ errs in relying on conservative treatment if "the record does not reflect that more aggressive treatment options are appropriate or available. A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist."); see also Chavez v. Colvin, No. ED CV-12-1771-PJW, 2014 WL 1289778, at *5 (C.D. Cal. Mar. 31, 2014) (finding error where ALJ did not specify what evidence in the record

---

[11] It is, perhaps, also worth noting the ALJ supports his "within normal limits" finding by only referencing medical records of physicians *other than* Dr. O'Laughlin; whereas, the ALJ appears to specifically exclude from discussion or reference any medical examinations conducted by Dr. O'Laughlin and documented in the nine exhibits (totaling nearly two hundred pages) of his medical records. This approach by the ALJ to support his findings appears to fly in the face of the Ninth Circuit's directive that both supporting and detracting evidence be considered, rather than isolating a specific quantum of supporting evidence. See Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The Court finds this wholesale exclusion of Dr. O'Laughlin's records particularly troubling where he was the only treating physician who specifically treated Plaintiff's fibromyalgia. See Chavez, 2014 WL 1289778, at *3, *6 (commenting that ALJ's decision to rely on opinion of non-specialist physician over opinion of treating rheumatologist ("the relevant specialty for fibromyalgia"), while "in and of itself . . . not cause for overturning the [ALJ's] decision," warranted further analysis; and ultimately remanding on the issue).

there was to suggest that plaintiff's fibromyalgia treatment was conservative, as opposed to some other more aggressive treatment used to treat the disease, which she refused).  Indeed, of the four hundred and ten pages of records referenced by the eight aforementioned exhibits,[12] the ALJ does not identify or discuss a single treatment Plaintiff received so as to characterize it as "conservative."  Nor does the ALJ elaborate on which of Plaintiff's myriad symptoms reportedly "improved," how they improved, or where such is designated in the record.

By failing to provide any further explanation as to what findings within those several hundred pages of records purportedly did or did not support Dr. O'Laughlin's medical source statements, the ALJ is impermissibly forcing this Court to speculate as to his reasoning.  Such vague and ambiguous reasoning hardly satisfies the "specific and legitimate" standard required here.  Regennitter, 166 F.3d at 1299; McAllister, 888 F.2d at 602.  Further, the Court cannot find the ALJ's reasoning is supported by substantial evidence where it unclear what evidence the ALJ is relying upon.

Second, pursuant to Ninth Circuit precedent and SSR 12-2P, the ALJ's finding that Dr. O'Laughlin's opinions "are not supported by the treatment records," including examinations which were "within normal limits," does not constitute a legitimate reason for discounting Dr. O'Laughlin's opinions pertaining to Plaintiff's fibromyalgia.  In Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004), the Ninth Circuit explained that fibromyalgia is a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Benecke, 379 F.3d at 590.  Common symptoms include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with the disease.  Id.  Importantly, "fibromyalgia is a disease that eludes objective measurement."[13]  Therefore, the Ninth Circuit

---

[12] The Court notes the ALJ pincites five pages of the record from amongst Exs. 12F, 13F, and 21F.  Given the context of the string cite, however, it is unclear whether the ALJ intended to only reference those five pages from the three aforementioned exhibits, or if he meant to be inclusive of the full exhibits, with reference to the pincites for emphasis.  Notably, the ALJ does not identify any pincites for the other exhibits, but appears to refer to them in their entirety.

[13] "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no

cautions ALJs against discounting a fibromyalgia patient's symptom testimony and the evaluations of her treating physicians based primarily on "lack of objective medical findings." Id. In Benecke, for example, the Ninth Circuit found the ALJ erred by "effectively requiring objective evidence for a disease that eludes such measurement," and "relying on his disbelief of [the claimant's] symptom testimony as well as his misunderstanding of fibromyalgia" to discount the opinions of the claimant's treating specialist physicians). Id. at 594. Similarly, in Revels v. Berryhill, the Ninth Circuit found the ALJ erred in rejecting the treating physician's opinion as "not supported by objective medical evidence," explaining that "[l]acking certain tender points does not rule out fibromyalgia-related symptoms . . . Moreover, a person with fibromyalgia may have muscle strength, sensory functions, and reflexes [that] are normal." Revels, 874 F.3d 648, 663 (9th Cir. 2017) (finding ALJ's analysis, which relied heavily on a nerve conduction and velocity study, x-rays, and spine MRIs yielding normal results, "demonstrates a fundamental lack of knowledge about fibromyalgia.") (internal quotations omitted); see also Lapeirre-Gutt, 382 Fed. App'x at 665 ("Independent of the ALJ's erroneous credibility analysis, the ALJ also erred in demanding 'objective evidence' of fibromyalgia."). To address these concerns, SSR 12-2P provides that tender-point examinations themselves constitute "objective medical evidence" of fibromyalgia. Revels, 874 F.3d at 663 (citing SSR 12-2P at *2–3). Moreover, the symptoms of fibromyalgia "wax and wane," and a person may have "bad days and good days." Id. That is why the Social Security Administration and the Ninth Circuit recommend looking at longitudinal records. Id.

In light of the foregoing authorities, this Court concludes the ALJ's rejection of Dr. O'Laughlin's opinion almost entirely on the vague assertion that it is "not supported by the treatment records" and is not consistent with the physical examinations that were "within normal limits," does not constitute a specific and legitimate reason supported by substantial evidence, and is contrary to the Ninth Circuit's holding in Benecke. 379 F.3d at 590.

Third, in light of SSR 12-2P's provision that tender-point examinations themselves constitute "objective medical evidence" of fibromyalgia, the ALJ's finding that Dr. O'Laughlin's

laboratory tests to confirm the diagnosis." Id. (citations omitted).

opinion is unsupported by the medical record appears significantly contradicted by the hundreds of pages of treatment notes in the medical records from Dr. O'Laughlin's treatment of Plaintiff since 2016 and other providers who treated Plaintiff's pain symptoms arising from her fibromyalgia.  To this point, a holistic review of examination findings in the record reveals, *e.g.*: tenderness of multiple points throughout the upper, mid, and lower back region; generalized weakness throughout the upper and lower extremity musculature with easy fatigue (AR 372 (Aug. 25, 2016)); positive fibromyalgia tender points in the neck, bilateral shoulders, bilateral arms, and mid-back (AR 510 (Mar. 28, 2017)); Plaintiff "persistently markedly sensitive to palpation in the suboccipital region with moderate to moderately deep palpation.  Even superficial palpation is uncomfortable for her . . . every fibromyalgia tender point is sensitive" (AR 505 (May 5, 2017)); positive tender points (AR 498 (Jun. 20, 2017)); tenderness to palpation over trigger points over the back of the cervical spine and anterior neck, lumbar spine, and hips bilaterally (AR 463 (Aug. 10, 2017)); "the physical exam shows [Plaintiff] is still markedly tender to palpation over most areas of her body, suboccipital, mid and lateral cervical region, the upper chest wall, over the arms to deltoids, and the epicondyles at the elbows over her back, buttocks, and lateral glutei, trochanteric bursa areas, and medial epicondyles of the knees. . . ." (AR 487 (Oct. 9, 2017)); tenderness to palpation over trigger points on neck anterior/posterior, hips, upper back, and neck (AR 455 (Nov. 9, 2017)); fibromyalgia tender points "were quite tender" (AR 843 (Apr. 20, 2018)); "pain all over" (AR 842 (May 22, 2018)); and consistent findings of marked tenderness to palpation on the fibromyalgia tender points from August 2018 through November 2019 (see AR 819, 808, 805, 804, 796, 794, 793, 783, 776; 771; 770; 761; 760).

Finally, the Court does not find the exhibits generally cited by the ALJ support his finding that "conservative treatment" resulted in "some improvement."  For example, neither Exhibit 4F nor 5F—which were both cited by the ALJ in support of his finding—make any reference to "improvement" or "conservative/non-conservative" treatments.  (See AR 372–82.)  Moreover, the exhibits cited by the ALJ contain records that appear to contradict the ALJ's finding of "improvement."  "Exhibit 12F/26–28," for example, is a May 5, 2017 treating record from Dr. O'Laughlin, in which he expresses concerns regarding getting proper medications instituted, due

to Plaintiff's apparent multiple chemical sensitivity, a "very grievous error" by the pharmacy in filling a prescription for naltrexone 0.5 mg with 50 mg instead, and Plaintiff's concerns about the costs of various prescription medications and her ability to afford them.  Dr. O'Laughlin further notes Plaintiff received IM injections of Toradol and Decadron,[14] but those "were only minimally beneficial to her" in that Plaintiff noticed "a slight improvement" which was accompanied with "extremely sharp and burning pains, [which] still are occurring."  (AR 504–06.)   In other treatment records contained in Exhibits 12F and 13F, Dr. O'Laughlin opines "I do not foresee a medication which is going to be of benefit to [Plaintiff].  A trial of buprenorphine resulted in extreme nausea.  At the lowest dose of Belbuca, she was completely unable to tolerate it.  She did tolerate very low dose Naltrexone," but could not afford the co-pay for it for longer than one month (AR 486–89); after taking a different medication, Plaintiff reported she "didn't notice a whole lot." (AR 498); Plaintiff reported medication side effects of nausea, excessive drowsiness and mental cloudiness, and consistently noted they were not providing her with adequate pain relief (AR 515, 519); and Dr. O'Laughlin notes Plaintiff was able to take Provigil for about a month, but thereafter could not afford the medication; aquatic pool therapy was also recommended, but Plaintiff could not follow through on that treatment due to economic and transportation concerns (AR 544–45).

At bottom, it seems plain even from the records cited by the ALJ that Plaintiff did not actually report "improvement" of her symptoms from injection treatment or medications.  Rather, a review of Plaintiff's persistent complaints of pain and ineffective medications spanning the multiple years of her treatment belie such a finding.  Thus, the ALJ's finding that Plaintiff reported "some improvement," based on reports of mere temporary relief immediately following injection treatment, mischaracterizes the record and does not amount to a legitimate reason supported by substantial evidence for discounting Dr. O'Laughin's opinion.  See Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2014) (finding "the ALJ improperly cherry-picked some of

---

[14] Notably, the Ninth Circuit has found steroidal injections to constitute an "aggressive," rather than "conservative" treatment option.  See, e.g., Trevizo v. Berryhill, 871 F.3d 664, 677 (9th Cir. 2017) (characterizing treatments such as steroid injections, block injections, recommendations for surgery, or even a referral to an orthopedic surgeon as "aggressive" treatment).

[the physician's] characterizations of [the claimant's] rapport and demeanor instead of considering these factors in the context of [the physician's] diagnoses and observations of impairment."); Holohan, 246 F.3d at 1207 (ALJ's reason for rejecting medical opinion was not supported by substantial evidence where he selectively relied on some entries and ignored many others that indicated continued, severe impairment).

On this record, the ALJ did not provide specific and legitimate reasons supported by substantial evidence for discounting the medical source statements of Dr. O'Laughlin (a treating physician of several years) in favor of the opinions of non-examining physicians such as Dr. Wong.  This is harmful error.  Accordingly, on remand, the ALJ must either provide specific and legitimate reasons for rejecting Dr. O'Laughlin's opinion, or factor the opinion into his assessment of Plaintiff's RFC.[15]

## B.    Remand

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional

---

[15] Based on this conclusion, the Court need not address Plaintiff's additional argument that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting her symptomology evidence.  Nonetheless, the Court notes that the ALJ largely proffers the same reasons for discounting Plaintiff's symptom testimony as he did for rejecting Dr. O'Laughlin's opinion; namely, the ALJ finds Plaintiff's symptoms were adequately treated through "conservative" treatment methods and many physical examinations were "within normal limits."  These findings largely fail to satisfy the clear and convincing standard for the reasons previously addressed.  Furthermore, the Court notes the ALJ faults Plaintiff for not always being compliant with her recommended treatment protocol, or being unwilling to take different medications; but the ALJ fails to acknowledge the documented reason Plaintiff could not continue certain medications or participate regularly in aquatic pool therapy was that she could not afford such medications and lacked transportation.  See Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995) ("Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds.").  The Court additionally notes the ALJ appears to mischaracterize the record by finding Plaintiff's ability to "attend college classes" demonstrates a greater functional capacity than alleged: the record indicates Plaintiff was taking one class, which was only one hour twice a week, and Plaintiff was "tolerating" it, but "has been capable of very little else, contributes very little to household chores, has been extremely sedentary at a very low functional level and has wind up of pain and fatigue with pushing, walking, and other activites.  (See, e.g., AR 543.)  Finally, the Court notes the ALJ fails to explain how the ADLs identified in his RFC discussion show "capacities that are transferrable to a work setting," or are otherwise inconsistent with Plaintiff's alleged limitations.  See Schiaffino v. Saul, 799 Fed. App'x 473, 476–77 (9th Cir. 2020); see also Zeitler v. Berryhill, No. 5:16-cv-00862-EJD, 2017 WL 4150978, at *6 (N.D. Cal. Sept. 19, 2017) (finding ALJ overstated the extent of plaintiff's daily activities and failed to describe "how often and for what time periods Plaintiff was able to do any of these activities," holding "absent more specific details about the frequency and extent of Plaintiff's activities, [the ADLs identified by the ALJ] cannot constitute 'substantial evidence'. . . .").  Thus, on remand, the ALJ must provide clear and convincing reasons for rejecting Plaintiff's testimony, or factor her symptoms into his RFC determination.

investigation or explanation.  Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v. Ventura, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d at 1292.  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. Varney v. Sec'y of Health & Human Serv., 859 F.2d 1396, 1399 (9th Cir. 1988).

The Court has determined the ALJ failed to provide clear and convincing or specific and legitimate reasons for the discounted weight he accorded Dr. O'Laughlin's medical opinion and Plaintiff's symptomology evidence.  The Court has also noted there remain contested issues regarding how much weight should be accorded to Dr. O'Laughlin's opinion and Plaintiff's symptomology evidence, as compared to the non-examining physicians discussed in the ALJ's decision.  Determination of these issues could impact other aspects of the ALJ's decision, such as evaluation of the other medical opinions, determination of the severity of all of Plaintiff's impairments and the combination thereof, the determination of Plaintiff's RFC, and consequently the ultimate determination of whether Plaintiff is able to perform work in the national economy. Therefore, the Court in its discretion finds that remand for further proceedings is appropriate, to hold a new hearing, reconsider the medical opinion evidence of record and Plaintiff's symptomology evidence under the appropriate standards, and issue a new decision.

## V.

## CONCLUSION AND ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.    Plaintiff's appeal from the decision of the Commissioner of Social Security (ECF No. 19) is GRANTED;

2.    The matter is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

3.    The Clerk of the Court is DIRECTED to enter judgment in favor of Plaintiff

1    Sheena Warecki and against Defendant Commissioner of Social Security.

2

3    IT IS SO ORDERED.

4    Dated:   **July 22, 2022**

    _____
    UNITED STATES MAGISTRATE JUDGE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28